Stuart H. STAKER, Plaintiff and Appellee,

v.

Noal D. AINSWORTH, Juanita Ainsworth Fox, David Ainsworth, Lynn Ainsworth, Jean Ainsworth, Jack Ainsworth, Beth Ainsworth, Freedom Yocum, Jr., Edna Yocum, Robert J. Holmes, Grant S. Jensen, Paul E. Holmes, Bruce E. Holmes, Helen Holmes, James Roger Shane and Elfriede Shane, Defendants and Appellees.

Noal D. AINSWORTH, Juanita Ainsworth Fox, David Ainsworth, Lynn Ainsworth, Jean Ainsworth, Jack Ainsworth, Beth Ainsworth, Third–Party Plaintiffs and Appellees,

v.

Conrad G. MAXFIELD and Utah National Corporation, Defendants and Appellants.

No. 870166.

Supreme Court of Utah.

Jan. 8, 1990.

Conrad G. Maxfield, David H. Day, Jay V. Barney, Murray, for defendants and appellants.

Joseph C. Rust, Salt Lake City, for Staker.

Jerrold S. Jensen, Salt Lake City, for the Holmeses and Jensen.

Mitchell J. Olsen, Midvale, for the Ainsworths.

Freedom and Edna Yocum, pro se.

James and Elfriede Shane, pro se.

DURHAM, Justice:

This is an appeal from a summary judgment in favor of appellees in which the trial court deferred to fence lines as property boundary lines over those established by a record title survey. In granting summary judgment, the trial court relied on the doctrine of boundary by acquiescence. Appellants contend that the trial court misapplied the doctrine and that summary judgment in their favor was warranted. We affirm the judgment and overrule *Halladay v. Cluff*, 685 P.2d 500 (Utah 1984), and its progeny as to the "objective uncertainty" requirement in boundary by acquiescence.

Appellants Conrad G. Maxfield and Utah National Corporation and appellees Stakers, Ainsworths, Yocums, Holmeses, Jensens, and Shanes own adjoining properties located approximately west of 300 West and east of the Rio Grande railroad tracks between 9400 South and 10000 South in Salt Lake County. The following diagram, not drawn to scale, illustrates the location of the properties involved in this case and their disputed boundaries.

Solid line indicates survey line
Dotted line indicates fence

In 1972, Maxfield purchased his parcel and received a warranty deed from his grantors for the portion enclosed by the fence lines. He also received a quitclaim deed for the portion between the fence and the record title survey line which borders the Ainsworths' property. The strip is approximately eighty feet wide. Seven years later, the Stakers had their parcel surveyed. The survey indicated a discrepancy of about eighty feet between the fence lines and the record title boundary lines on both sides of the property. The Ainsworths had a survey done in 1981 which yielded similar results.

On May 7, 1985, the Stakers filed a complaint against the Ainsworths, Yocums, Holmeses, Jensens, and Shanes, seeking to judicially determine the boundary lines of their properties. Shortly thereafter, some of those defendants—appellees in this appeal—counterclaimed against the Stakers, alleging that the Stakers' action constituted a cloud on their titles. On August 10, 1985, the Ainsworths filed suit against Maxfield and others, seeking to quiet title according to the fence lines. They also filed a motion in January 1986 to consolidate the Staker action, in which various parties had joined. In January 1987, the Ainsworths filed a motion for summary judgment, in which the Stakers, Holmeses, Jensens, Yocums, and Shanes joined. Max-

field also filed a motion for summary judgment that month. On March 23, 1987, the trial court denied Maxfield's motion and granted the Ainsworths'. Apparently basing the decision on the doctrine of boundary by acquiescence, the trial judge's order declared the fence lines separating the parcels to be the true and proper boundary lines.

Maxfield and Utah National Corporation appeal the ruling and contend (1) that summary judgment in favor of appellees was in error because genuine issues of material fact exist and (2) that the trial court misapplied the doctrine of boundary by acquiescence.

In reviewing a motion for summary judgment, all doubts and uncertainties concerning issues of fact are viewed in the light most favorable to the party opposing summary judgment. *Hill v. State Farm Mut. Auto. Ins. Co.*, 765 P.2d 864, 866 (Utah 1988). Where a triable issue of material fact exists, the cause will be remanded for determination of that issue. *Id.* In this case, the trial court ruled in favor of the fence lines by applying the doctrine of boundary by acquiescence. Therefore, there must exist undisputed facts in the evidence before the trial court relating to each of the elements of that doctrine in order for us to affirm the ruling.

Historically, the doctrine of boundary by acquiescence included four factors: "(1) occupation up to a visible line marked by monuments, fences, or buildings, (2) mutual acquiescence in the line as a boundary, (3) for a long period of time, (4) by adjoining landowners." *Goodman v. Wilkinson,* 629 P.2d 447, 448 (Utah 1981); 12 Am. Jur.2d *Boundaries* § 85 (1964 & Supp. 1989). In *Halladay v. Cluff,* 685 P.2d 500 (Utah 1984), this Court added a fifth element to this list of factors: "objective uncertainty" as defined in that case.

■ It is clear that the fourth requirement, that there be adjoining landowners, has been met in this case. Although the various diagrams and maps before the trial court differ somewhat, they all reflect that the parcels involved are contiguous. Further, there is no indication that the parties to this suit are not the true owners of the property in dispute and therefore have no standing to sue. Similarly, there are no allegations that the parcels lacked occupation up to a visible line—the first requirement. Houses were built and occupied; land was farmed, improved, and irrigated; and livestock was kept. Lynn Ainsworth's affidavit, for instance, is typical in that it indicates that the Ainsworth family has farmed the property within the fence lines since at least 1930.

■ Pursuant to the third requirement, the claimed boundary line must also have been in existence for "a long period of time" to establish boundary by acquiescence. In most states, this period is the same as the limitations period for adverse possession. Note, *Boundary by Agreement and Acquiescence in Utah,* 1975 Utah L.Rev. 221, 228 & n. 57. However, this Court concluded in *Hobson v. Panguitch Lake Corp.,* 530 P.2d 792, 795 (Utah 1975), that only under unusual circumstances would a common law prescriptive period of less than twenty years be sufficient to establish boundary by acquiescence. *See*

*also Parsons v. Anderson,* 690 P.2d 535, 539 (Utah 1984) (fifteen years of mutual acquiescence in a fence as a boundary did not fulfill requirement). Viewed in the light most favorable to appellants, the evidence in support of summary judgment was sufficient to establish that the fence lines had existed for a long period of time. Various affidavits state that present landowners remember the fences from their childhoods, which indicates that the claimed boundary lines have been in existence for at least thirty years. Other affiants stated that they recalled making repairs to existing fences as long ago as 1956. (Newer portions of the fence replaced washed-away or deteriorated sections but apparently were constructed to substantially follow the old boundary lines.) Finally, appellants concede in their brief that "[t]he fence lines involved in this case were probably established as long ago as the 1890's." Thus, the evidence establishes that the fence lines have been in existence for at least thirty years and perhaps as long as ninety years, satisfying the third requirement of boundary by acquiescence.

■ The record also supports the conclusion that there was mutual acquiescence in the fence line as a boundary for a long period of time, fulfilling the second requirement. Of course, there was no acquiescence from 1985, when the first claim regarding this dispute was filed. Arguably, there may have been no acquiescence after 1972, when Maxfield purchased his property.[1] It appears, however, to be undisputed that successive landowners until 1972 or 1985 regarded the fences as the true boundary lines from the time they were first erected. As mentioned earlier, this probably was as early as 1890. There is no indication in the record that any predecessor in interest behaved in a fashion inconsistent with the belief that the fence line was the boundary. Owners occupied houses, constructed buildings, farmed, irrigated, and raised livestock only

---

**1.** As previously noted, Maxfield's predecessor in interest gave him a quitclaim deed for the disputed strip of land bordering the Ainsworths' property. Conrad Maxfield's affidavit states that shortly after the purchase, he personally notified Heber Ainsworth that he did not regard the fence line as the true boundary. Heber Ainsworth died in 1979, but the Ainsworth family denies that the conversation ever took place.

within their respective fenced areas. One residence in particular, belonging to the Shanes, is built up to a fence line and is cut into two parts by the new survey line. This house has been standing for over eighty years. Additionally, there is no indication that any landowner ever notified his neighbor of a disagreement over the true boundary. This scenario is different from the one in *Parsons v. Anderson*, where mutual acquiescence for the required period was lacking. In that case, the plaintiffs tore down significant portions of the fence and, without objection by the defendants, proceeded to plant trees and shrubs, store firewood, and construct a chain link fence in a different location. *Id.* at 539. No similar factors exist in this case.

■ We conclude that the undisputed facts establish all of the first four requirements of the doctrine of boundary by acquiescence. There are, however, problems associated with proof of the fifth requirement, that of objective uncertainty. We have been persuaded by the problems presented in this case to reconsider that requirement, enunciated by *Halladay* and succeeding case law.[2] *Halladay* and its progeny would require that the property line as shown on the record title not be displaced by another boundary

> unless it is shown that during the period of acquiescence there was some objectively measurable circumstance in the record title or in the reasonably available survey information (or other technique by which record title information was located on the ground) that would have prevented a landowner, as a practical matter, from being reasonably certain about the true location of the boundary.

By the same token, a claimant cannot assert boundary by acquiescence if he or his predecessors in title had reason to know the true location of the boundary during the period of acquiescence.

*Halladay*, 685 P.2d at 505; *see also Stratford v. Morgan*, 689 P.2d 360, 364 (Utah 1984). In other words, there must have been a particular form of dispute. The dispute may not be proved by evidence of mere differences of opinion or by a mere lack of actual knowledge of the true location of the boundary. *Halladay*, 685 P.2d at 505. The uncertainty or dispute must instead be measured against an objective test of reasonableness. The party claiming boundary by acquiescence has the burden of proving objective uncertainty as part of his prima facie case. *Id.* at 507.

In this case, appellants contend that appellees have not shown that the fence lines arose out of a dispute or uncertainty as measured by an objective standard. The record reveals that the trial judge inquired several times as to when a dispute first arose, but appellees' counsel was unable to answer satisfactorily. In an attempt to protect what appears to have been regarded as the true boundary line since 1890, appellees claim that the fence lines were established according to erroneous surveys, in particular a survey allegedly made by Alvin Rock in the 1920s. They also point to possible survey mistakes dating back to the first settlement of the region. Proof of such errors would possibly fulfill the objective uncertainty requirement in *Halladay*.[3] The available evidence concerning this issue, however, is demonstrably incomplete, conflicting, and confusing. It is unclear, and apparently impossible to establish,

---

**2.** We note considerable recent commentary criticizing our decisions in this area. *See, e.g.,* Backman, *The Law of Practical Location of Boundaries and the Need for an Adverse Possession Remedy,* 1986 B.Y.U.L.Rev. 957, 965–82 [hereinafter Backman]; *Recent Developments,* 1985 Utah L.Rev. 131, 193 [hereinafter 1985 Utah L.Rev.]; Note, *Objective Uncertainty in Boundary by Acquiescence: Halladay v. Cluff,* 1984 B.Y.U.L.Rev. 711.

**3.** Among other examples, the *Halladay* opinion cites "disagreement among different surveyors on location of boundary line" as establishing

objective uncertainty. *Halladay,* 685 P.2d at 506 (citations omitted). Appellees also rely heavily on footnote 7 in that opinion, which states in part:

> [A] boundary located on a survey line *could* qualify for boundary by acquiescence, even though a subsequent survey showed the original survey to have been in error.... If the original survey was in error, that is a clear instance of objective uncertainty, and boundary by acquiescence will apply if its other elements are proved.

*Id.* at 508 n. 7.

whether an actual erroneous survey occurred or what the results were. That is not unexpected or unusual in a case involving boundary lines and surveys as old as these. This problem illustrates some of the difficulties associated with imposing a requirement of objective uncertainty in boundary by acquiescence. As Justice Howe pointed out in his dissent in *Halladay*,

> In the first place, a survey may have actually been made and the boundary marked on that line. Because of the lapse of many years, no one who was then present may be alive or available. Just because a recent survey shows the marked boundary to be incorrectly placed does not prove that its then owners, many years ago, did not have a survey made on which they relied in establishing the marked boundary. As finer and more precise instruments of survey are developed, property lines established in accordance with earlier surveys may after be shown to be out of place by later surveys.... The majority assures us that a new survey would not necessarily be allowed to upset a boundary set on an earlier survey. But after the lapse of many years, no one may know that an earlier survey was made. Thus, the later survey will be followed and the boundary, long recognized, will be moved.

685 P.2d at 509 (Howe, J., dissenting). Justice Howe's second point also bears repeating:

> [T]he boundary dispute is here and now. It does little good to reflect as to what the then owners 30, 40 or 50 years ago might have done and disregard entirely the conduct of the owners and their successors since that time in acquiescing in the markers on the ground. In most cases, the acquiescence is an unconscious act with no thought being given during the period of acquiescence to the boundary, let alone with surveying it.

*Id.* Finally, Justice Howe concludes, "[I]t is not unjust in certain cases to require disputing owners to live with what they and their predecessors have acquiesced in for a long period of time." *Id.* at 510.

It is not difficult to understand why this Court adopted a fifth element. As the majority opinion in *Halladay* noted, "The doctrine of boundary by acquiescence has been the source of considerable confusion and controversy among judges, lawyers, and landowners in this state." *Id.* at 503 (citations omitted). The opinion proceeded to explain that much of the confusion resulted from the intermingling of two related doctrines: boundary by acquiescence and boundary by agreement. In previous opinions, this Court even referred to the doctrines as though they had merged into one. *See, e.g., Hobson v. Panguitch Lake Corp.*, 530 P.2d at 794. The pivotal case upon which the *Halladay* majority relied in expressly declaring uncertainty or dispute a requirement in boundary by acquiescence was *Tripp v. Bagley*, 74 Utah 57, 276 P. 912 (1928). In that case, the following statements are found:

> [O]ne of the requisites necessary to the establishment of a boundary line other than the true boundary line between adjoining landowners by oral agreement or acquiescence ... is that the location of the true boundary sought to be thus established is or has been uncertain or in dispute.

*Tripp*, 74 Utah at 67, 276 P. at 916 (citations omitted).

> It thus becomes of controlling importance to determine whether two adjacent landowners may establish a boundary line between their lands by oral agreement *or by acquiescence* for a long period of time, when there is no uncertainty as to the location of the true boundary line....

*Tripp*, 74 Utah at 69, 276 P. at 917 (emphasis added).

Cases which followed *Tripp* seized upon this dicta, which we now deem to be unfortunate in its impact, and intermittently began to refer to a showing of uncertainty or dispute in a boundary by acquiescence context. *See, e.g., Leon v. Dansie*, 639 P.2d 730, 731 (Utah 1981); *Glenn v. Whitney*, 116 Utah 267, 272–73, 209 P.2d 257, 260 (1949); *Peterson v. Johnson*, 84 Utah 89, 93, 34 P.2d 697, 698–99 (1934). The discus-

sion in *Tripp*, however, occurred in an analysis of an express parol agreement problem and not in a boundary by acquiescence situation. Uncertainty and dispute were important in that case only insofar as they were needed to overcome a statute of frauds bar to an oral agreement. In an effort to clear up the ensuing confusion, and based upon what the Court believed at the time to be "the more recent cases" and "the clear weight of authority that the relevance of this ingredient is settled in our law," we concluded in *Halladay* that a requirement of objective uncertainty would minimize conflict with the statute of frauds and avoid litigation while promoting stability in boundaries. *Halladay*, 685 P.2d at 505.

The new requirement, however, appears to have defeated the very purposes for which it was added and has, we now believe upon careful reflection, rendered the doctrine lifeless. As noted in Justice Howe's dissents in *Halladay v. Cluff*, 685 P.2d at 508, *Stratford v. Morgan*, 689 P.2d at 365, and *Parsons v. Anderson*, 690 P.2d at 540, boundary by acquiescence has always been restrictively applied in Utah. Nevertheless, it fills an important gap in the law left unaddressed by other doctrines.[4] For instance, settling a dispute under boundary by agreement requires that there was an express agreement between the parties. If actual knowledge of the boundary exists, there is no consideration exchanged and the agreement fails. Since sufficient proof of an agreement is often difficult to come by, the doctrine of boundary by agreement is not often invoked. There are similar problems in applying the estoppel theory to settle boundary disputes. Thus, the doctrine of boundary by acquiescence, based largely on policy considerations (of avoiding litigation and promoting stability in

landownership) fills a small but important gap.

The doctrine of boundary by acquiescence derives from realization, ancient in our law, that peace and good order of society is [sic] best served by leaving at rest possible disputes over long established boundaries. Its essence is that where there has been any type of a recognizable physical boundary, which has been accepted as such for a long period of time, it should be presumed that any dispute or disagreement over the boundary has been reconciled in some manner. *Baum v. Defa*, 525 P.2d 725, 726 (Utah 1974) (footnotes omitted).

The problems that have emerged in our case law, which have been noted in recent commentary as well, indicate that the *Halladay* requirement of objective uncertainty makes boundary by acquiescence less practical, further restricts what was already a restrictive doctrine, and "effectively eliminate[s] boundary by acquiescence as a viable doctrine for settling property disputes in Utah." 1985 Utah L.Rev. at 194. The result of *Halladay* and its progeny has been "to convert a doctrine that was originally predicated on the policy of settling boundaries by reference to long acquiesced in lines into a doctrine that [serves] as a basis for challenging boundaries not founded on recent survey information." *Id.* at 201. Thus, in contrast to the purpose of the objective uncertainty requirement, it now appears that its use may increase litigation over boundaries rather than decrease it. *Id.*

The dissenting opinion criticizes this reversal of position, and it is certainly not particularly comfortable for an appellate court to decide it has made a mistake. However, much of the dissent's focus on the role of stare decisis and judicial restraint simply has no application to a state

---

**4.** Three major doctrines have been developed to resolve boundary disputes among adjoining landowners: estoppel, boundary by agreement, and boundary by acquiescence. Backman at 962–68. The estoppel theory requires the combination of acts or representations by the original landowner and reliance by a neighbor on those representations in order to establish a boundary. Boundary by agreement, premised on a contractual theory, requires "(1) an agreement, (2) between adjoining landowners, (3) settling a boundary that was uncertain or in dispute, and (4) executed by actual location of a boundary line." Backman at 963. In addition, Utah requires mutual acquiescence for a long period of time. The elements in boundary by acquiescence have been noted previously in this opinion.

supreme court in its common law development function. The rule we change today is a judge-made rule which has been soundly criticized by every scholarly reference to it.[5] It is a highly technical, historically debated, somewhat arcane rule of property law, not some fundamental principle of constitutional law or social policy. Having become convinced that the objective uncertainty requirement of *Halladay* was a mistake, we change the rule accordingly.

Consequently, we overrule the fifth requirement of objective uncertainty contained in *Halladay v. Cluff* and affirm the summary judgment entered in favor of appellees.

HOWE, Associate C.J., and ZIMMERMAN, J., concur.

HALL, Chief Justice (dissenting):

I dissent based upon the principles of stare decisis and judicial self-restraint, precepts having significant application to the development of law by the courts.[1] Appellants have not requested or sought on appeal consideration of our established boundary by acquiescence doctrine or the overruling of *Halladay v. Cluff*[2] and its progeny. Indeed, except for appellees Holmes and Jensen, none of the parties seek the extraordinary involvement in which a majority of the Court endeavors to participate. Further, the issue of the continuing validity and force of the "objective uncertainty" element reelucidated in *Halladay* is not properly before us and has not been adequately briefed. And based upon the facts of this case, reaching the issue is unnecessary since the trial court's decision may be correctly affirmed without consideration or application of the objective un-

certainty element. Accordingly, overruling established rules and settled case law is untimely, unwarranted, and unwise.

Today's decision needs be controlled [b]y the important doctrine of stare decisis, the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion. That doctrine permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact. While stare decisis is not an inexorable command, the careful observer will discern that any detours from the straight path of stare decisis in our past have occurred for articulable reasons, and only when the Court has felt obliged "to bring its opinions into agreement with experience and with facts newly ascertained."

Our history does not impose any rigid formula to constrain the Court in the disposition of cases. Rather, its lesson is that every successful proponent of overruling precedent has borne the heavy burden of persuading the Court that changes in society or in the law dictate that the values served by stare decisis yield in favor of a greater objective. In [this case] we have been offered no reason to believe that any such metamorphosis has rendered the Court's long commitment to a rule of reversal outdated, ill-founded, unworkable, or otherwise legitimately vulnerable to serious reconsideration. On the contrary, the need for such a rule is as compelling today as it

---

5. We have not hesitated in other instances to reverse case law when we are firmly convinced that we have erred earlier. *See, e.g., State v. Hansen,* 734 P.2d 421, 427 (Utah 1986), *overruling State v. Norton,* 675 P.2d 577 (Utah 1983); *State v. Tuttle,* 713 P.2d 703, 704 (Utah 1985), *overruling State v. Brady,* 655 P.2d 1132 (Utah 1982); *American Fork City v. Crosgrove,* 701 P.2d 1069, 1075 (Utah 1985), *overruling Hansen v. Owens,* 619 P.2d 315 (Utah 1980).

1. *See generally Davis v. Modine Mfg. Co.,* 526 F.Supp. 943 (D.C.Kan.1981); *Krupp v. Sackwitz,*

30 Ill.App.2d 450, 174 N.E.2d 877 (1961); *City of Rocky River v. State Employ. Relations Bd.,* 43 Ohio St.3d 1, 539 N.E.2d 103 (1989); *Bonkowsky v. Bonkowsky,* 69 Ohio St.2d 152, 431 N.E.2d 998, *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1352 (1982); *Crown Controls, Inc. v. Smiley,* 110 Wash.2d 695, 756 P.2d 717 (1988) (en banc); *In re Mercer,* 108 Wash.2d 714, 741 P.2d 559 (1987); *Antoniewicz v. Reszcynski,* 70 Wis.2d 836, 236 N.W.2d 1 (1975).

2. 685 P.2d 500 (Utah 1984).

was at its inception.[3]

The exceptional action of overruling existing precedent "demands special justification."[4] As Justice Stevens has eloquently stated:

> Of even greater importance, however, [than the fact that existing precedent (1) did not state a rule fundamentally at odds with current understanding of constitutional rights; (2) was not rested upon discredited interpretation of relevant historical documents; and (3) cannot be characterized as unreasonable or egregiously incorrect] is my concern about the potential damage to the legal system that may be caused by frequent or sudden reversals of direction that may appear to have been occasioned by nothing more significant than a change in the identity of this Court's personnel. Granting that a zigzag is sometimes the best course, I am firmly convinced that we have a profound obligation to give recently decided cases the strongest presumption of validity. That presumption

is supported by much more than the desire to foster an appearance of certainty and impartiality in the administration of justice, or the interest in facilitating the labors of judges. The presumption is an essential thread in the mantel of protection that the law affords the individual. Citizens must have confidence that the rules on which they rely in ordering their affairs—particularly when they are prepared to take issue with those in power in doing so—are rules of law and not merely the opinions of a small group of men who temporarily occupy high office. It is the unpopular or beleaguered individual—not the man in power—who has the greatest stake in the integrity of the law.

> For me, the adverse consequences of adhering to an arguably erroneous precedent in this case are far less serious than the consequences of further unraveling the doctrine of stare decisis.[5]

Justifications for refusing to apply the doctrine of stare decisis sometimes exist,[6] but

---

**3.** *Vasquez v. Hillery,* 474 U.S. 254, 265–66, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986) (quoting *Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 412, 52 S.Ct. 443, 449, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting)).

**4.** *See Arizona v. Rumsey,* 467 U.S. 203, 212, 104 S.Ct. 2305, 2310, 81 L.Ed.2d 164 (1984) (citations omitted).

**5.** *Florida Department of Health and Rehabilitative Servs. v. Florida Nursing Home Ass'n,* 450 U.S. 147, 152–55, 101 S.Ct. 1032, 1035–37, 67 L.Ed.2d 132 (1981) (Stevens, J., concurring) (footnotes omitted; citing in part B. Cardozo, *The Nature of the Judicial Process,* 149 (1921) (" '[T]he labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who had gone before him.' "); *Pollock v. Farmers' Loan & Trust Co.,* 157 U.S. 429, 652, 15 S.Ct. 673, 716, 39 L.Ed. 759 (1894) (White, J., dissenting) (" 'The fundamental conception of a judicial body is that of one hedged about by precedents which are binding on the court without regard to the personality of its members. Break down this belief in judicial continuity, and let it be felt that on great constitutional questions this court is to depart from the settled conclusions of its predecessors, and to determine them all according to the mere opinion of those who temporarily fill its bench, and our Constitution

will, in my judgment, be bereft of value and become a most dangerous instrument to the rights and liberties of the people.' "), *overruled on other grounds, South Carolina v. Baker,* 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988)); *accord Webster v. Reproductive Health Services,* 492 U.S. ——, ——, 109 S.Ct. 3040, 3077–79, 106 L.Ed.2d 410, 461–63 (Blackmun, J., concurring in part and dissenting in part).

**6.** *See, e.g., Webster,* 492 U.S. at ——, 109 S.Ct. at 3056, 106 L.Ed.2d at 435 (construction of constitution proved " 'unsound in principle and unworkable in practice' " (quoting *Garcia v. San Antonio Metro Transit Authority,* 469 U.S. 528, 546, 105 S.Ct. 1005, 1015, 83 L.Ed.2d 1016 (1985), *overruled on other grounds as recognized in Board of Governors v. United States Dep't of Labor,* 722 F.Supp. 1301 (E.D.N.C.1989)); *South Carolina v. Gathers,* 490 U.S. ——, ——, 109 S.Ct. 2207, 2217–18, 104 L.Ed.2d 876, 891–92 (1989) (Scalia, J., dissenting) ("freshness of error" of case decided only two years earlier and fact that case involved capital punishment justified departure from precedent); *Florida Nursing Home Ass'n,* 450 U.S. at 152–53, 101 S.Ct. at 1035–36 (Stevens, J., concurring) (overruling not justified since rule not *fundamentally* at odds with scope of constitutionally protected civil rights, rested upon discredited interpretation of historical documents, or unreasonably or egregiously incorrect), and cases cited therein; *Burnet,* 285 U.S. at 412, 52 S.Ct. at 449 (Brandeis, J., dissenting) (experience and newly

even if the arguments in favor of overruling *Halladay* may on their surface seem appealing,[7] the appropriate rationalizations are either not available[8] or at most unconvincing in this case, and the proponents have not "borne the heavy burden of persuading the Court that *changes* in society or in the law dictate that the values served by stare decisis [must] yield in favor of a greater objective."[9] Instead, appellees Holmes and Jensen (the only parties urging the overruling of our settled boundary by acquiescence standard) expressly argued below for the continued application of *Halladay* and its progeny. Counsel for these parties stated in part:

> Justice Howe has been consistent in his dissent in all three cases in saying that the majority opinion of the Supreme Court has sounded the death knell to the doctrine of boundary by acquiescence. In fact his opinion is the sole [dissenting] opinion, and as I read those cases is not an accurate portrayal of boundary by acquiescence as advocated by the Supreme Court since 1984.
>
> . . . .
>
> I disagree vehemently that the State of Utah has outlawed in essence the doctrine of boundary by acquiescence. . . .
>
> . . . .
>
> I do not believe, as Justice Howe states ... that a [sic] boundary by acquiescence has been invalidated in the State of Utah. I believe it is a valid doctrine, but the [C]ourt is saying we are not going to allow every fence case that comes down the pike is a boundary action

[sic]. We see a fence case we are going to look at it [sic]. Did the owners intend this to be a boundary? Was there ever a boundary by acquiescence?

In short, these appellees claimed, "The doctrine of boundary by acquiescence [as stated in *Halladay* ] is alive and well in the State of Utah and should be applied in the present case." It was not until appellants submitted their brief on appeal urging continued application of *Halladay* and its progeny, that appellees Holmes and Jensen made an about-face and, without significant analysis, suggested the unnecessary overruling of *Halladay, Stratford v. Morgan,*[10] and *Parsons v. Anderson*[11] and the discarding of the "objective uncertainty" requirement.[12] Of more importance than the observation that appellees have neither acknowledged nor explained this recent divergence is the fact that they have not offered any new facts, claims, or special justifications,[13] in view of other decisions by the Court in this context,[14] meriting "serious reconsideration" or rendering the "Court's long commitment to a rule of reversal outdated, ill-founded, unworkable, or otherwise legitimately vulnerable to serious reconsideration."[15] In fact, these appellees are still urging affirmance of the trial court's decision resolving the boundary issue along fence lines.

The impact of this premature or inappropriate decision to discard settled precedent is even more critical in view of the continued compelling reasons for adhering to stare decisis in applying the settled bound-

---

ascertained facts discussed as rationale relevant to variation of opinions and stare decisis policy).

7.   *See Florida Nursing Home Ass'n,* 450 U.S. at 151, 101 S.Ct. at 1035 (Stevens, J., concurring).

8.   *See id.* at 153 n. 9, 101 S.Ct. at 1036 n. 9.

9.   *Vasquez,* 474 U.S. at 266, 106 S.Ct. at 624 (emphasis added).

10.   689 P.2d 360 (Utah 1984).

11.   690 P.2d 535 (Utah 1984).

12.   *See generally Florida Nursing Home Ass'n,* 450 U.S. at 151 n. 1, 101 S.Ct. at 1035 n. 1

(Stevens, J., concurring) (reverse of position by parties in case).

13.   *Rumsey,* 467 U.S. at 212, 104 S.Ct. at 2310.

14.   *See, e.g., Grayson Roper Limited Partnership v. Finlinson,* 782 P.2d 467 (1989); *Parsons,* 690 P.2d 535; *Stratford,* 689 P.2d 360; *Halladay,* 685 P.2d 500; *Wood v. Myrup,* 681 P.2d 1255 (Utah 1984); *Condas v. Willesen,* 674 P.2d 115 (Utah 1983); *Leon v. Dansie,* 639 P.2d 730 (Utah 1981) (per curiam); *Madsen v. Clegg,* 639 P.2d 726 (Utah 1981); *Brown v. Peterson Dev. Co.,* 622 P.2d 1175 (Utah 1980); *Park v. Farnsworth,* 622 P.2d 788 (Utah 1980); *Hales v. Frakes,* 600 P.2d 556 (Utah 1979).

15.   *Vasquez,* 474 U.S. at 266, 106 S.Ct. at 624.

ary by acquiescence principles. The cited cases were considered with care after extensive briefing. The Court has consistently accepted and applied the established law,[16] and careful reconsideration of those factual situations which *Halladay* and its progeny served to solve mandates continued support for the settled precedent. In fact, without application of the objective uncertainty element, the first four elements of boundary by acquiescence may often appear to exist in situations where the doctrine and the principles behind it are not in actuality satisfied. In contrast, to speculate that, due to application of this settled doctrine, problems have emerged in our case law, boundary by acquiescence has proved less practical, and the doctrine increases litigation by serving as a basis for challenging boundaries not founded on recent survey information ignores the realities of the situations, the benefits of these well-deliberated concepts, and the policy considerations at issue.

Also, any perceived "problems" which might be presented by this case do not justify reconsidering the objective uncertainty requirement. This is primarily so because the trial court's determination may be correctly affirmed without application of this specific element. The best evidence before the court was that the fences were placed upon what an erroneous survey determined were the actual property lines. Appellants' attempt to refute these proffered facts was unsuccessful. Nevertheless, even if this Court were to conclude that the objective uncertainty element was improperly considered below (or were to be applied anew on remand), appellees would prevail since the remaining elements of boundary by acquiescence were unquestionably satisfied and appellants have not carried their burden of overturning this determination on appeal.[17] This fact further encourages reliance upon principles of stare decisis and the conclusion that it is improper to use this case to overturn our established precedent where briefing is inadequate and the facts do not demand the same.

Certainly "unfortunate problems" may appear to exist in cases which come before us. But "problematic cases" persuaded us in the first instance to apply the established criteria.[18] And "solving" perceived problems in this case may only serve to create other concerns in cases pending or in situations where other parties have relied upon the established precedent. There will always exist cases which might be labeled "unfair," where justices may individually wish that the law were otherwise. However, to allow such a case to precipitate premature decision making will only result in bad law and is to turn the Court's processes into nothing more than emotional reflexing. Until such time as the issue is adequately before us and the Court has been properly briefed and counseled from both prospectives as to the benefits and detriments of discarding our established doctrine and precedent, in short, until the case demands it, justice would be better served by following the principles of stare decisis and refraining from addressing the objective uncertainty issue here. The Court has successfully followed this approach as it concerns other legal issues.[19]

The fact that this case should appropriately be affirmed notwithstanding elimination of the *Halladay* precedent, together

16. *See supra* note 14 and accompanying text; *cf. City of Akron v. Akron Ctr. for Reproductive Health, Inc.,* 462 U.S. 416, 419 n. 1, 103 S.Ct. 2481, 2487 n. 1, 76 L.Ed.2d 687 (1983) (compelling reasons for adhering to stare decisis discussed).

17. *Grayson Roper Ltd. Partnership,* at 472 (limitation of *Halladay* urged but party failed to otherwise carry burden of overturning finding).

18. *See supra* note 14 and accompanying text.

19. *See, e.g., Cottam v. Heppner,* 777 P.2d 468 (Utah 1989) (precedent regarding availability of deficiency judgments in commercially unreasonable sale cases under Uniform Commercial Code not considered or overruled because unnecessary to case); *State v. Earl,* 716 P.2d 803, 805–06 (Utah 1986) (state constitutional issues, although existent, not considered by Court since not raised; "It is imperative that Utah lawyers brief this Court on relevant state constitutional questions."), *cited in State v. Lafferty,* 749 P.2d 1239, 1247 & n. 5 (Utah 1988) (nominal reliance on state constitutional provisions without briefing is inadequate to trigger analysis).

with the rationale noted above which urges adherence to stare decisis principles, may be encapsulated in a precept often termed "judicial self-restraint." Judicial self-restraint is "[s]elf-imposed discipline by judges in deciding cases without permitting themselves to indulge their own personal views or ideas which may be inconsistent with existing decisional or statutory law."[20] As noted by one commentator in the context of legislative and constitutional analysis,

> [J]udicial restraint means that courts should exercise their unquestioned authority of judicial review only in compelling cases....
>
> Judicial restraint in constitutional matters is not only important to good government; it is a mainstay of our constitutional system. It is also an essential element of a strong judiciary....
>
> Judicial restraint is a free-standing value, whose worth is independent of the substantive issue in the particular case....
>
> ... Judicial decisions are usually influenced by what lawyers urge the courts to do, not because judges become less bold once they don their robes of office, but because that is the way a legal system governed by the case or controversy limitation works. The judge makes his or her decision in the context of competing views presented by adversaries in a lawsuit....
>
> ....
>
> ... Judicial restraint is ... a good example of the even broader principle that the highest manifestation of respect for power is willingness, on appropriate occasions, to refrain from using it.[21]

A court's opinion should not substantially exceed the resolution urged by lawyers.[22] In the analogous context of the evaluation of constitutional issues, the United States Supreme Court has developed a series of rules whereby it avoids passing upon a large part of the constitutional questions pressed upon it. These include:

(1) The Court will not pass upon the constitutionality of legislation in a friendly, non-adversary proceeding, declining because to decide such questions "is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy between individuals. It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act."

(2) The Court will not "anticipate a question of constitutional law in advance of the necessity of deciding it." "It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case."

(3) The Court will not "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."

(4) The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter....

(5) The Court will not pass upon the validity of a statute upon complaint of one who fails to show that he is injured by its operation....

(6) The Court will not pass upon the constitutionality of a statute at the instance of one who has availed himself of its benefits.

(7) "When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this

**20.** *Black's Law Dictionary,* 762 (5th ed. 1979).

**21.** R. Lee, *The Supreme Court and Antitrust Law: Remarks on Judicial Restraint in the Context of Antitrust and Constitutional Law,* 1982 B.Y.U.L.Rev. 873, 876–81.

**22.** *Cf. id.* at 877.

Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." [23]

The wisdom underlying these rules has application in the instant case. Realizing that the law will be better served in the long run by deciding cases only upon existing appropriate grounds, appellate courts should avoid anticipating, formulating, or passing upon questions of law, especially questions involving the overruling of precedent and the principles of stare decisis, unless absolutely necessary or required by the precise facts of the case. While rules of law may merit reconsideration and perhaps, in some instances, revamping by the Court, law made or changed in a vacuum without the benefit of a pertinent case controlled by or hinged upon the application of a specific issue and without the benefit of counsel's briefing is no better law than that which the efforts themselves seek to correct, and it may in many instances amount to worse law, raising problems not heretofore planned for or seen. This case should not be used as a vehicle to overturn settled law. When a case actually turns on the validity of the boundary by acquiescence principles enumerated in *Halladay* and its progeny, there will be time enough to resolve that case and those issues. [24]

Finally, I also dissent since the majority's opinion implicitly indicates that summary judgment was inappropriately granted, thus requiring remand in this case. In considering an appeal from an adverse deci-

sion on a motion for summary judgment, an appellate court must inquire whether there is any genuine issue as to any material fact and, if there is not, whether the moving party is entitled to judgment as a matter of law. [25] As we have repeatedly stated:

"In reviewing the record on any appeal from summary judgment, we treat the statements and evidentiary materials of the appellant as if a jury would receive them as the only credible evidence, and we sustain the judgment only if no issues of fact which could affect the outcome can be discerned." [26]

This standard is identical to that utilized by the trial court. [27] Thus, in reviewing each case, we, as was required below, must be mindful that "[i]f there is any genuine issue as to any material fact, summary judgment should be denied." [28] To successfully oppose a motion for summary judgment, it is not necessary for the party to prove its legal theory. [29] Indeed, it only requires one sworn statement to dispute the claims on the other side of the controversy and create an issue of fact. [30] In resolving the issue, the court does not judge the credibility of the claims or the witnesses or the weight of the evidence. [31]

Notwithstanding these established rules, the majority's consideration of the record reflects the existence of myriad disputed facts centered around the boundary issue. The majority implicitly emphasizes the inappropriateness of the order granting sum-

**23.** *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1935) (Brandeis, J., dissenting in part) (citations, quoted sources, and footnotes omitted); *accord Webster,* 492 U.S. at ——, 109 S.Ct. at 3060–61, 106 L.Ed.2d at 440–41 (O'Connor, J., concurring in part and concurring in the judgment).

**24.** *Cf. Webster,* 492 U.S. at ——, 109 S.Ct. at 3061, 106 L.Ed.2d at 441 (O'Connor, J., concurring in part and concurring in the judgment) (time to reexamine case is when validity of statute actually turns on validity of case).

**25.** *Zions First Nat'l Bank v. Clark Clinic Corp.,* 762 P.2d 1090, 1092 (Utah 1988).

**26.** *Id.* (quoting *Merrill v. Cache Valley Dairy Ass'n,* 750 P.2d 539–40 (Utah 1988)).

**27.** *Durham v. Margetts,* 571 P.2d 1332, 1334 (Utah 1977), *cited in Briggs v. Holcomb,* 740 P.2d 281, 283 (Utah Ct.App.1987).

**28.** *Ruffinengo v. Miller,* 579 P.2d 342, 343 (Utah 1978) (footnote omitted).

**29.** *Salt Lake City Corp. v. James Constructors, Inc.,* 761 P.2d 42, 47 (Utah Ct.App.1988).

**30.** *Holbrook Co. v. Adams,* 542 P.2d 191, 193 (Utah 1975).

**31.** *See id.; Mountain States Telephone and Telegraph Co. v. Atkin, Wright, and Miles Chartered,* 681 P.2d 1258, 1261 (Utah 1984).

mary judgment by noting that the facts are unclear as to (1) how long the fences established for boundary purposes have been in existence; (2) whether there was acquiescence in the fences as boundaries after 1972 and whether successive landowners from 1890 until 1972 regarded the fences as the true boundaries; and (3) whether an actual erroneous survey of the boundaries was made and what the survey results were. These "disputed facts" might be perceived as such given the brevity of the trial court's order granting summary judgment. While findings of fact are unnecessary in deciding summary judgment motions,[32] a brief written statement justifying summary judgment would provide a more effective basis for an appellate court to review the judgment[33] by clarifying the " 'mind of the court' and the analysis used to resolve the dispute."[34] While in my view summary judgment was not inappropriately granted in this case, if a majority of the Court implicitly concludes otherwise, the case should be remanded for a trial on the disputed issues. As noted above, in doing so reconsideration of the boundary by acquiescence doctrine is still unnecessary and inappropriate.

Based upon the foregoing, I would affirm the trial court's ruling and not offend principles of stare decisis and judicial self-restraint by straining to reach the issue of the objective uncertainty element of our settled boundary by acquiescence doctrine.

STEWART, J., concurs in the dissenting opinion of HALL, C.J.

**32.** *Weber ex rel. Weber v. Springville City*, 725 P.2d 1360, 1363 (Utah 1986), *cited in Taylor v. Estate of Taylor*, 770 P.2d 163, 168 (Utah Ct.App. 1989).

**33.** *See Masters v. Worsley*, 777 P.2d 499, 501 (Utah Ct.App.1989) (importance of written statement in context of motion based on multiple grounds).

**34.** *Id.* (quoting *Dover Elevator Co. v. Hill Mangum Investment*, 766 P.2d 424, 426 (Utah Ct.App.

1988), and citing *Parks v. Zions First Nat'l Bank*, 673 P.2d 590, 601 (Utah 1983)). Appellants noted in their brief, "Inasmuch as the lower court did not recite any facts in its summary judgment ruling, it is unknown which of the controverted facts or other facts alleged in the affidavits were accepted by the court and on what basis the decision was made to hold as a matter of law that the doctrine of boundary by acquiescence applied to defeat the record title." (Citation omitted.)